Gants, J.
The plaintiff, Thomas Lynch (“Lynch”), was employed by Xylogics when it was acquired by Bay Networks, Inc. (“Bay Networks”) in 1996. As a Bay Networks employee, Lynch qualified for stock option grants under the Bay Networks Stock Option Plan ("the Plan”), and later was awarded Bay Network stock options. Under the Plan, the vesting of stock options ended upon the termination of employment. However, vested stock options could be exercised for a period of ninety days following the employee’s termination. When the defendant Nortel Networks Corporation (“Nortel”) acquired Bay Networks in 1998, Nortel continued to honor the stock option vesting rights in the Plan but the options granted were in Nortel, not Bay Networks, stock at a fixed conversion ratio.
In April 2000, Lynch was a senior buyer for Nortel, engaged primarily in contracting for goods and services on behalf of Nortel’s real estate group. That month, Lynch and certain other Nortel employees were told that their purchasing functions were being “outsourced” to Price Waterhouse Coopers LLP (“Price Waterhouse”), effective May 1, 2000, and that their employment with Nortel would be terminated. At the same time, Lynch was offered a position as a senior buyer at Price Waterhouse. Lynch accepted Price Waterhouse’s offer, and was paid a signing bonus of three percent of his salary. Among the agreements that Lynch signed when he joined Price Waterhouse was *375 an April 10, 2000 letter agreement “concerning certain of the stock options . . . granted to [Lynch] under the [Plan]” (“the Agreement”). While under the Plan the vesting of stock options would have ended when Lynch left Nortel’s employ, the Agreement permitted Lynch’s Nortel stock options to continue to vest for a year beyond his termination as long as he remained employed by Price Waterhouse. However, the Agreement also provided:
Notwithstanding the foregoing, [Lynch] shall not be permitted to, and agree[s] not to, exercise . . . (ii) any Unvested Options ... or any Vested Options following the earlier of (a) 4:00 p.m. on the date which is five business days after the date [Lynch] cease[s] to be employed by [Pricewaterhouse] . . ., other than if such employment ceases due to [Lynch’s] death.
Agreement at page 2. In accordance with the terms of the Agreement, Lynch on April 20, 2000 signed a duplicate copy of the Agreement, acknowledging his acceptance of its terms. Lynch admits that this Agreement was a binding contract that was part of his overall severance package with Nortel.
The defendant UBS Paine Webber, Inc. (“Paine Webber”) was retained by Nortel to administer Nortel’s stock option program and serve as the exclusive broker for the exercise of Nortel options. On October 13, 2000, Lynch voluntarily terminated his employment at Price Waterhouse in order to accept a job as a senior buyer at Transkaryotic Therapies, Inc.
One day before his termination, Lynch telephoned Paine Webber’s toll-free information line and spoke with a Paine Webber employee named “Dave.”[1] According to Lynch, he gave Dave his name, social security number, and the PIN number for his account, and asked him to look up how long Lynch had to exercise his stock options. Dave told him he had 90 days following his termination to exercise his stock options, and referred Lynch to a document called Nortel Networks Corporation Stock Option Program Frequently Asked Questions, which was available on Paine Webber’s website and had been updated on July 26, 2000 (“FAQ”). During the telephone call with Dave, Lynch did not inform Dave that he was an employee of Price Waterhouse rather than Nortel or a Nortel-controlled company or affiliate. Nor did he tell Dave that he had signed a stock option agreement with Nortel before he left its employ. Rather, he simply assumed that Nortel had already provided Paine Webber with this information, and that Paine Webber accessed this information when it punched in his name and social security number into the computer.
Shortly after the telephone call, Lynch went to the website and pulled the FAQ. He reviewed the answer to question 22, which declared that the terms of an assumed Stock Option Plan, such as Bay Network’s, are different from the terms of the Nortel Networks Stock Option Plan. The FAQ stated:
While the options were converted to options for Nortel Networks on date of acquisition or merger, any grants made under the assumed Stock Option Award Program prior to the date of acquisition are still governed by the terms of the assumed Stock Option Plan.
In addition, when an employee’s employment status changes, the treatment of stock options under the acquired Stock Option Plan and the Nortel Networks Stock Option Plan differ.
FAQ, Answer to question 23
Lynch relied on Dave’s statement that he had ninety days to exercise his stock options, and delayed attempting to exercise those options until December 2000, at which time he learned that his opportunity to exercise his stock options had expired. During the entire period in which Lynch had relied on the incorrect information provided during the October 12 telephone call, Lynch had a copy of the Agreement in his Nortel severance file, which he kept at his home and knew where to find. Lynch knew that this Agreement described his rights with respect to the exercise of stock options but he never attempted to retrieve this document to examine its terms.
Lynch has filed an Amended Complaint seeking in damages the money value of the Nortel stock options that he claims he would have timely exercised had he not been given inaccurate information by Dave.[2] Nortel and Paine Webber have joined in moving for summary judgment as to all claims. After hearing and for the reasons stated below, the motions for summary judgment brought by Nortel and Paine Webber are ALLOWED.
DISCUSSION
Lynch has brought six claims in his Amended Complaint:
Count I: Breach of contract against Nortel;
Count II: Negligent misrepresentation against Nortel and Paine Webber;
Count III: Negligent performance of contractual duties against Paine Webber;
Count IV: Negligence against Paine Webber;
CountV: Declaratory relief; and
Count VI: Negligence against Nortel.
While Lynch has six claims in theory, for all practical purposes, there is only one claim that warrants serious attention — Count II, alleging negligent misrepresentation.[3]
To prevail on his claims of negligent misrepresentation, Lynch must prove that (1) that the information furnished by Dave at Paine Webber was erroneous; (2) that Nortel was negligent in failing to provide Paine Webber with accurate information about the terms of Lynch’s Agreement governing his exercise of stock options, and Paine Webber was negligent in commu *376 nicating inaccurate information to him without taking due care to ensure its accuracy; and (3) that he justifiably relied to his detriment on the erroneous information. See Nycal Corporation v. KPMG Peat Marwick LLP, 426 Mass. 491, 496 (1998), citing Restatement (Second) of Torts, §552(1) (1977). “A claim for negligent misrepresentation is ordinarily one for a juiy, unless the undisputed facts are so clear as to permit only one conclusion.” Golber v. BayBank Valley Trust Company, 46 Mass.App.Ct. 256, 257 (1999).
This Court shall not dwell on the first two elements. As to the first, there is no dispute that the information Dave provided to Lynch was erroneous. As to the second, this Court finds that there is a material dispute of fact as to whether Nortel and Paine Webber were negligent in communicating (or causing to be communicated) this erroneous information. The crux of this motion lies with the third element — whether, on the undisputed facts of this case, Lynch, as a matter of law, was not justified in relying on the information Dave provided him during their telephone call. This Court, on these facts, finds as a matter of law that Lynch was not justified in relying on Dave’s information.
This Court believes it appropriate to decide this issue as a matter of law rather than leave it to be decided by a juiy for the following reasons. First, “(t]he general rule is that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not or whether he can read or not.” Gifford v. Gifford, 354 Mass. 247, 248 (1968), quoting Cohen v. Santoianni, 330 Mass. 187, 193 (1953). Lynch signed an Agreement when he left Nortel that governed his exercise of Nortel stock options, knew that he had signed such an Agreement, and knew precisely in his home where he could find that Agreement. Yet, he chose not to retrieve that Agreement and learn what deadline it provided for concerning his exercise of stock options. If he had read the Agreement, he reasonably should have seen that he had only five business days to exercise his stock options once he ended his employment with Price Waterhouse. The language imposing this deadline was not written in simple English, but it was plain enough for a person of average intelligence to understand and certainly plain enough for Lynch, who had been a senior buyer for Nortel, reasonably to understand. Lynch cannot claim that he justifiably relied on Dave’s interpretation of the Agreement when he made no effort himself to read that Agreement and, if he had, reasonably would have understood that the deadline was five business days, not ninety days. See Harrington v. Fall River Housing Authority, 27 Mass.App.Ct. 301 (1989) (finding no justifiable reliance as a matter of law when landlord relied on oral information from housing authority staff that differed from the applicable federal regulations).
Second, not only did Lynch not retrieve the Agreement from the severance file in his home, but he failed even to explain to Dave that he was no longer a Nortel employee and had signed an Agreement when he left Nortel that governed his exercise of Nortel stock options. Lynch knew that, when he left Nortel and joined Price Waterhouse, he was given a separate Agreement stating new terms regarding the vesting and exercise of his Nortel stock options. It was not reasonable for Lynch to rely on information from Dave concerning the deadline for his exercise of stock options without informing Dave that he had left Nortel, was presently with Price Waterhouse, and had executed a separate agreement that governed, among other things, the deadline for exercising these options. Indeed, it should have been apparent to Lynch that it was unreasonable to rely on this information from Dave without providing him with the necessary background information after Dave referred him to the Frequently Asked Questions document, which assumes that the reader is a Nortel employee and makes no reference to former Nortel employees who are currently Price Waterhouse employees.
This Court recognizes that Lynch contends that he believed that, by giving Dave his name, social security number, and PIN, Dave could access information specific to him in the Paine Webber computer database. However, even if this assumption were reasonable, it was not reasonable to assume that the Paine Webber computer database contained personalized information as to each former employee’s stock option exercise deadline, especially when such deadlines were governed by the terms of the Plan or, as here, by a separate written agreement. Certainly, there is nothing that Dave said to Lynch to indicate that he had information personal to Lynch as to the deadline for exercising stock options set forth in Lynch’s severance Agreement with Nortel.
In short, Lynch cannot fail to look at the Agreement and then give inadequate information to the Paine Webber representative, and then contend that he reasonably relied on the resulting misinformation, especially when that misinformation directly contradicted the plain language of the Agreement. If Lynch had first tried to read the Agreement, then called Paine Webber and asked for its interpretation of the language of that Agreement, and then relied on its misinformation, the outcome of this motion would likely have been different.[4]
ORDER
For the reasons stated above, the motions for summaiy judgment brought by Nortel and Paine Webber are ALLOWED. Judgment shall enter for the defendants, with statutory costs.

Dave’s last name was not used in the telephone conversation and remains unknown.

The parties strongly differ as to the measure of damages in this case, because the price of Nortel common stock plummeted after Lynch left Price Waterhouse. In view of the grant of summary judgment as to liability, this Court need not resolve this interesting dilemma.

Count I alleges breach of contract, but Lynch concedes that the Agreement he executed upon his termination from Nortel gave him only five business days following the end of his employment with Price Waterhouse to exercise his stock options. He also concedes that Paine Webber did not have the authority to amend the Agreement that he executed with Nortel, so Dave certainly could not have orally amended the Agreement in his brief telephone conversation with Lynch. Consequently, there is plainly no breach of contract here, and summary judgment is warranted on the breach of contract claim.
Counts III, IV, and VI, when stripped to their core, allege nothing more than the negligent misrepresentation alleged in Count II. Count V seeks declaratoiy relief but any such relief must derive from a finding that Lynch is entitled to prevail on his claim of negligent misrepresentation. Therefore, this case rises or falls on the fate of Count II.

As noted earlier, since all of Lynch’s claims effectively have justifiable reliance as an element, all his claims must fail as a result of this Court’s finding that there is no justifiable reliance here as a matter of law.